[No. 31139. Department One. February 16, 1950.]

*In the Matter of the Application of* CATHERINE HEIN, *Appellant,* v. TOM SMITH, *as Superintendent of the State Penitentiary, Respondent.*[1]

*James Tynan,* for appellant.

*The Attorney General* and *John D. Blankinship, Assistant,* for respondent.

SCHWELLENBACH, J.—This is an appeal from an order denying a petition for a writ of *habeas corpus.*

Petitioner, as the mother of Richard Hein, a minor of the age of sixteen years, filed an original application in this court for a writ of *habeas corpus,* alleging that Richard Hein

[1] Reported in 215 P. (2d) 403.

was restrained of his liberty at the state penitentiary at Walla Walla under a judgment and sentence of the superior court of Snohomish county. This court ordered the respondent to appear before the superior court of Snohomish county and show cause, if any, why the petition should not be granted. The hearing was held before Honorable Charles R. Denney, Judge, and the above order entered.

Richard Hein was tried and convicted in the superior court of Snohomish county of the charge of murder in the first degree of one James Moore. Upon appeal, this court affirmed the judgment and sentence. 32 Wn. (2d) 315, 201 P. (2d) 691.

The present *habeas corpus* action was brought under the authority of Rem. Supp. 1947, §§ 1075 and 1085-2, which sections provide that the scope of the inquiry in *habeas corpus* proceedings includes alleged violations of rights guaranteed a petitioner by the constitution of the state of Washington or the constitution of the United States. The constitutional grounds urged before the trial court and on this appeal are violations of Art. I, §§ 7 and 9 of our state constitution, and the fourteenth amendment of the Federal constitution.

Art. I, § 7, provides that:

"No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

Art. I, § 9, provides that:

"No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for the same offense."

It is alleged that the trial court wrongfully admitted in evidence a so-called "confession," in that the "confession" was unlawfully taken from the person of the defendant at a time when he was not under arrest, contrary to Art. I, § 7. It is further alleged that the admission of the "confession" in evidence required the defendant to take the stand in order to refute it, thus compelling him to give evidence against himself in violation of Art. I, § 9. As to the

invasion of rights guaranteed by the due process clause of the fourteenth amendment of the Federal constitution, it is contended that defendant was denied a fair trial, and that two witnesses, Inez Pitzer and Joe Jensen, gave perjured testimony at the original trial.

In order to properly discuss the issues in this matter, we find it necessary to review briefly some of the evidence given in the original trial. The body of James Moore was discovered November 18, 1947. Inez Pitzer, a school girl, testified at the original trial that, on the day before the murder was reported in the newspapers, Richard told her and another girl that he had "murdered a guy" for a red hat which he was wearing. She testified that they did not believe him and thought he was joking. At the present hearing, Inez testified that she thought the conversation took place the latter part of the week (which would be after the newspapers told of the murder) although she wasn't certain. Under cross-examination, she identified a written statement which she had given, reciting that the conversation occurred on Tuesday, November 18th, and that the article appeared in the paper on Wednesday.

To get back to the story, the night the article appeared in the paper, Joe Jensen, a schoolmate of Richard, told his folks that he knew the boy who had murdered the man. The officers learned of this and contacted Joe. He was brought to the sheriff's office and questioned, after which he made the following statement in his own handwriting:

"Nov. 24, 1947

"I Joe Jensen write this on my own free will.

"On November 17 or 18 about 12:50 we were going over to the gas station on 26th and Broadway and he told me.

"He said he went into visit this man James Moore Saturday night and he took the cane and broke the lamp that was in the room. When lamp was broking he hit the man on the back of the head and broke the cane and then went into the kitchen to get some stove wood and hit him across his eyes and the bridge of his nose and Mr. James Moore went over backwards on the floor He was afrade he would squeal and then he went into the kitchen and got a knife and cut his throat three times and took his $15.00 money

out of his bill fold and threw the knife the junk yard.
Saturday night.

"[signed] Joe Jensen Witness By
 [signed] E. L. Weaver
 [signed] John J. Refsnes"

On the strength of Jensen's statement, Richard was ar-
rested, brought to the sheriff's office and questioned. He
denied any knowledge of the crime. He then was con-
fronted with Joe, who repeated his story, which was de-
nied by Richard.

 At the *habeas corpus* hearing, Joe Jensen testified
that he perjured himself at the former trial; that the per-
jured testimony was given because of threats of the officers
to send him to the reformatory if he did not so testify. He
said that he talked to Richard on Thursday, rather than on
Monday or Tuesday, and that Richard had the newspaper
with him telling of the murder.

Joe's sister, Virginia, was called by the state and testified
that Joe was home the evening the paper came. While
the folks were reading the account in the paper, Joe told
them that a boy had told him about killing the man. At
the conclusion of the present hearing, the court summed
up the question of perjury as follows:

"Now, as to the alleged perjury. I think it undoubtedly
must be shown in order to warrant the granting of a writ
of habeas corpus, that the officers, particularly the prose-
cution officers, or at least the peace officers, were guilty
of securing perjured testimony, and knowingly presenting
it to a jury and the Court. That has not been established
here.

"As far as the witness, Pitzer, is concerned, she does not
assert that any officer or prosecuting officer of any kind ever
said a word to her about it. She simply says now, almost
two years later, that her recollection is that it was Thurs-
day instead of Monday or Tuesday when this statement was
made, or before the crime had been discovered. Well,
common sense dictates that her recollection a week after
the event is much better than it is now, almost two years
after the event. So certainly there was no perjury there.

"As to the evidence submitted on behalf of Petitioner
given by Joe Jensen, the overwhelming weight of the evi-

dence is that Joe Jensen told these officers the details of what Richard Hein had told him, upon their first encounter at the school house. That is the direct and positive testimony of Mr. Refsnes. By implication, at least, it is the testimony of Mr. Sheridan, because Mr. Sheridan says when he first called at the sheriff's office about five o'clock, and before the statement had been secured off the person of Richard Hein, that he was presented with this statement and he read it. Therefore, it must have been given before the so-called 'confession' was found upon the person of Richard Hein.

"Mr. Weaver was not examined in any great detail about that matter, but the door lay wide open for cross examination as to all the details of the investigation, and none was made.

"The testimony of Joe Jenkins [Jensen] here upon the stand in this proceeding was so unsatisfactory, it was so inconsistent; there were so many discrepancies in it, that this Court after hearing it all is firmly of the opinion that Joe Jenkins [Jensen] told the truth upon the witness stand, and that he did not tell the truth here before this Court; that he told the truth at the time of the trial originally, but that he did not tell it here.

"I can not find any circumstances or fact to lead the reasonable mind to believe that any perjury was committed in that case."

Our examination of the exhibits and the testimony of both hearings convinces us that the trial court was correct.

To return again to the narrative, after having been questioned for a considerable length of time by the officers, Richard was asked to empty his pockets. In his wallet was found the "confession" which was quoted in our prior opinion, and which it is now claimed was taken from him illegally because he was not then under arrest.

This matter was gone into very thoroughly by the trial court at the first trial. A motion was made to suppress the evidence, and the court, after examining the affidavits for and against the motion, denied it. Furthermore, at the first trial, deputy sheriff E. L. Weaver testified as to how he and deputy John Refsnes picked up Richard at the Recreation Pool Hall. Under cross-examination, he testified:

"A. John started out with them and I followed along with him. Q. John started out with both of· them. Did he have hold of them? A. He had hold of the Hein boy, yes. Q. He had hold of the Hein boy? A. Yes. Q. And he didn't say anything to him that you heard at all, except to just go and take hold of him and start taking him out of there? A. At that time, no. Q. At that time that's all he did? A. Yes. Q. Then when was it that you told him he was under arrest? A. When we put him in the car. Q. When you got him out and put him in the car you told him he was under arrest? . A. Yes. . . . Q. Did you hear the boy make any protests, or ask anything about what it was all about? A. We told him he was under arrest. Q. I say, did you hear the boy make any protest to John Refsnes while he was taking him out of the Recreation Pool Hall? A. He asked something about calling his father, that's the only thing I heard him say. Q. That is the only thing you heard him say, that he wanted to call his father? A. Yes. Q. No one said anything about their being arrested until you got them over to the automobile? A. That's right. Q. Then, when you were putting him into the car what did you say to him? A. Told him he was under arrest. Q. Told who? A. This boy here (indicating),—Hein."

Officer Jackson testified concerning what took place at the sheriff's office. Under cross-examination, he testified:

"Q. Now, you say that after he was brought to the jail—first, I will ask, where were you when he was first brought to the jail by Weaver and Refsnes? A. I don't remember where I was. I don't know whether I was even there at the jail when he came in or not. Q. How long afterward was it that you came there? A. Well, I was there before five o'clock. Q. You were there before five. You don't know how much the others might have talked to him before you came? A. No, I don't. I don't think they talked to him though before I came. They might have talked to him, too, now. I wouldn't be too sure of that. Q. When was it you informed him that he was charged with murder. A. When I was talking to him in the sheriff's office. Q. After you had talked to him how long? A. Well, our first conversation was when I was asking about the murder of James Moore. Q. That's right. And that, of course, Mr. Jackson is not what I asked you. How long had you talked to him before you told him that he was to be charged with it?

A. He was informed about the first word I spoke to him, that he was being held for the murder of James Moore."

█ We are convinced from the record in both cases that, at the time the "confession" was taken from Richard Hein's bill fold, he was then under arrest for the murder of James Moore, and that the taking was lawful. We therefore find no merit in the contention that the introduction of the "confession" in evidence by the state compelled defendant to incriminate himself.

The judge who heard the *habeas corpus* matter did not preside at the original trial. At this hearing, he allowed great latitude in the examination of witnesses. He considered the age of the boy. He appreciated the fact that it was his duty to protect this boy in all rights guaranteed to him under the constitution. He was patient and fair. From the record, he could not have decided otherwise.

The order of the trial court is affirmed.

SIMPSON, C. J., BEALS, GRADY, and DONWORTH, JJ., concur.

---

March 21, 1950. Petition for rehearing denied.